**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00244-CR**
**NO. 09-19-00245-CR**

_____

**ANTONIO JERRLEE ARY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause Nos. CR32278 & CR32279**

**MEMORANDUM OPINION**

A jury found Antonio Jerrlee Ary guilty of burglary of a habitation, with intent to commit aggravated robbery, and capital murder of Ray Burger. *See* Tex. Penal Code Ann. §§ 19.03(a)(2), 30.02(d). The trial court assessed punishment at twenty years of imprisonment for the burglary and life imprisonment without the possibility for parole for the capital murder. In two issues on appeal, Ary (1) asserts the trial court committed reversible error by admitting evidence consisting of text messages

1

he argues pertain to an extraneous offense and (2) challenges the legal sufficiency of the evidence supporting Ary's convictions because he contends there was insufficient evidence to corroborate the accomplice witness testimony. We affirm.

Evidence at Trial

Testimony of Jonathan Johnson

Jonathan Johnson testified that he lived near 1010 Elaine Street with his wife and children in September 2015. According to Johnson, Michelle and Charles Brown rented a trailer home at 1010 Elaine Street that was near other trailers, and that Johnson would talk to them "[e]very once in a awhile when they would dig through [his] trash and just kind of leave stuff scattered." According to Johnson, "[n]ormally there was a lot of traffic in and out [of the trailers at] all times of day and night[,]" and he agreed that there were "sketchy people coming in and out[.]"

Johnson testified that at approximately 10:45 p.m. or 11 p.m. on September 13, 2015, he was on his front porch and noticed a "blue station wagon like a 350 Magnum" pull up on the street alongside the driveway at 1010 Elaine instead of into the driveway, which "seemed a little abnormal[.]" According to Johnson, two African-American males got out of the vehicle, one from the driver's side back seat and one from the passenger's side front seat. Johnson testified he saw the "stocky" male that got out of the front passenger seat stumble and stabilize himself on a mailbox, the taller and slender male from the back driver's seat helped the other male

2

a little, and they "took off to the front side of the trailer which [Johnson] lost sight of." Johnson testified that he heard a female voice from inside the car saying, "Hurry up. Hurry up." Johnson went inside his house to get a cigarette and was getting ready to step back out on his front porch when he heard a gunshot from the direction of the nearby trailers. He testified he ran to his back bedroom, grabbed a gun to protect himself and his family, looked out the front door peephole to see if anything was going on, and saw that the car he had seen earlier was gone.

Johnson testified that he heard someone say, "They killed him. They killed him[,]" and Johnson assumed it was Michelle Brown saying it because she was the only female he knew to be living there. According to Johnson, people were frantically running around in the trailer, and when Johnson stepped back outside his house, he saw the back door of the trailer open and he heard someone screaming, "You got to get out of here. Get out of here. You don't need to be here[,]" and then Johnson saw two white males leave the back of the trailer with a white bag and they went into the vacant lot next door. Johnson called 911. Johnson testified that the Browns and another female from inside the trailer house jumped in a red car and tried to leave, and almost backed into the opposite ditch, and the police arrived and activated the patrol car's lights so the red car could not leave. Out of fear of retaliation, Johnson did not want to provide a statement that night, but he told the

3

first police officer at the scene that he pawould provide a statement the next morning. According to Johnson, he later gave a recorded statement to law enforcement.

Testimony of Officer Brian Chowns

Officer Brian Chowns with the Dayton Police Department testified that he was working the evening shift on September 13, 2015, and he was dispatched around 10:30 or 10:45 p.m. to the trailer park on Elaine Street. In-car video from Chowns' patrol car as he arrived on the scene was admitted into evidence and played for the jury.

According to Officer Chowns, he was the first officer on the scene, and when he was walking up to the scene, he heard loud voices from the furthest trailer. As he was going around the corner at the mailbox he saw a red passenger car reversing with the passenger side door open "like somebody was still trying to get into the vehicle as they were trying to flee." According to Officer Chowns, the vehicle almost hit him, and it was traveling at a high rate of speed. Officer Chowns noticed the driver's face covered in blood, and he determined he "needed to get them stopped to figure out what exactly was going on." Officer Chowns stopped the vehicle, and he pulled his weapon and held the driver at gunpoint, and four people got out of the vehicle. According to Officer Chowns, the people were all talking at once and saying that their son had been shot and he was dead in the trailer. Officer Chowns asked

4

them who did it, and they said they did not know but that it was somebody in a silver passenger car.

Officer Chowns entered trailer "Number 4[]" through the front door and found a white male lying on the floor in the back bedroom, not moving or breathing, with a pool of blood around his head from an apparent gunshot wound to the head. The door to the bedroom "was completely detached from the hinges[]" and the back door was open. Officer Chowns called EMS and he and Officer Siebert cleared the house for safety. Chowns testified that the EMT told him that the victim was deceased, and detectives were notified to start working the scene and collecting evidence.

According to Chowns, the people outside were separated to keep them from communicating with each other before being interviewed by law enforcement. Officer Chowns described the people at the scene as upset and crying, and one person with blood on his face "seemed dazed," Chowns transported Charles Brown to the police station.

Testimony of Charles Brown

Charles Brown testified that he and his wife, Michelle, lived in a rented mobile home or trailer "Number 4" at 1010 Elaine Street in Dayton on September 13, 2015. According to Brown, T.C. Duncan is a friend of his, and at that time Brown was letting him stay in one of the bedrooms in the mobile home for a couple of days. Brown explained that Duncan was dealing methamphetamines and would deliver

them to buyers, but that Duncan would sell the drugs outside the trailer and not inside the trailer. Brown testified that he was using methamphetamines in September 2015, and he would buy the drugs from Duncan.

Around 9:15 p.m. on the night of September 13, 2015, the Browns, Chucky Hogan, and Jamie Storey left the mobile home to walk to the Chevron on FM 1960 because Storey, a friend of Duncan's, wanted to get ice cream. Duncan, Austin Ainsworth, Trey Everett, Ray Burger, and Ainsworth's and Duncan's girlfriends stayed at the house, and did not go with them to the store. Once at the store, Storey suggested they play the slot machines there and gave them money to play, and they played until about 11 p.m.

When they got back home, the door was locked, and Brown's wife knocked and asked for someone to unlock the door. When they got inside, Everett said, "They shot him. They shot him." Brown testified that Everett appeared to have open wounds above his eyes and on his cheek, Everett's face had blood all over it, and Everett said someone had taken a pistol and whipped him in the face with it. Brown saw Duncan at the back door, and Duncan was "holding a shotgun, and he was shaking all over." Brown testified that the shotgun was his and he kept it in the house for protection even though his wife and Duncan were not supposed to be in possession of a gun because she was on parole and Duncan was a felon. According

6

to Brown, he took the shotgun from Duncan and threw it under a trailer "three trailers down" so Brown's wife would not get in trouble.

Brown was shocked when he saw Burger and he attempted CPR on Burger, but it was unsuccessful. Brown testified that a door in the trailer was "busted off the hinges[,]" and he recalled moving the door. Brown went to the front room, and everyone was panicking and running outside, so he went outside, and the police arrived. Brown said he did not try to leave before the police got there, but Hogan, Everett, and Ainsworth attempted to leave in Everett's red car, but the police stopped them.

Brown explained that he thought of Burger like a son, he had known him since Burger was seventeen years old, and that Burger was twenty-eight years old when he died. Brown had known Duncan for two or three years, and Duncan gave Brown money to stay in his trailer. According to Brown, he had only recently met Everett, Ainsworth, and Storey, and Brown used to work for Hogan's stepfather and would "hang out sometimes[]" with Hogan. Brown and the others knew Duncan was dealing drugs, Everett would deliver the drugs, and Ainsworth and Storey used methamphetamine. Brown was home earlier in the day of the murder, but he did not recall seeing Duncan make any drug deals that day, he did not recognize the names Jennifer Paddy, Cori Cadoree, Kay Chambers, or Dre Bush, and did not recall seeing any of them in his trailer earlier that day.

Testimony of Detective Steven Rogers

Steven Rogers testified that on September 13, 2015, he was a detective with the Dayton Police Department. He was dispatched to 1010 Elaine at about 11:25 p.m. regarding a shooting. Detective Rogers photographed the scene and collected evidence. According to Detective Rogers, he found a deceased man, whom he later identified as Ray Burger, inside the bedroom in the trailer where Duncan was living. Burger had been shot between his eyes and "pretty much in the bridge of the nose[.]" Rogers testified that the bedroom door had been "knocked off or kicked off or pushed off of the door frame" and there was a bullet hole at the top of the door and an exit hole on the other side of the door. Rogers collected the bedroom door and swabbed portions of the door for testing. He also swabbed blood on the hallway carpet, blood from the kitchen, and blood from the victim. Rogers collected a .357 Sig shell casing from the hallway and behind the broken door. Rogers also bagged a shotgun that law enforcement found under a trailer on the opposite side of the trailer park. Rogers did not remember the shotgun having any shells in it, but he did find shells in the bedroom. Rogers testified that the shotgun was the only gun he recovered from the scene, and he sent it to DPS for test firing. Rogers also collected a black T-shirt from the scene and sent it to the DPS crime lab for comparison to any DNA that might be collected from the scene.

Rogers collected three cell phones from the room where Burger's body was found, and Rogers took them, as well as other phones he received later, to the Baytown Police Department to extract information from the phones. Duncan voluntarily gave his cell phone to Rogers, which Rogers photographed at the scene. According to Rogers, he collected Everett's wallet at the scene and Everett died in an unrelated automobile accident sometime after Burger's death. Rogers found a digital scale under the bed commonly used to measure out narcotics, and he also found a trace amount of a crystal-like substance he believed was either methamphetamine or cocaine near Burger. According to Rogers, he collected a small glass pipe from the room that he believed was used for smoking methamphetamine and he had no doubt that someone was selling methamphetamine in that room. According to Rogers, a few days after the incident, Duncan voluntarily provided him with Duncan's shoes that had blood on the bottom of them and had the pattern that matched footprints in the crime scene photos, and Rogers sent the shoes for lab testing. A neighbor at the scene told Rogers that he saw a black male getting out of a vehicle and stumble and place his hand on the Brown's mailbox, so Rogers swabbed the mailbox and sent the swabs for lab testing. Rogers did not see any fingerprints on the mailbox so he did not attempt to lift fingerprints from it. Rogers also received gun-shot residue, fingernail clippings, a gray shirt, white socks, black

9

belt, sunglasses, and the bullet from the victim's head collected by the morgue and gave them to the DPS lab.

Rogers received a Sig Sauer .22 caliber pistol from a Texas Ranger, and it was delivered to the Texas DPS crime lab for fingerprinting and ballistics testing. According to Rogers, he picked up a .38 caliber Rossi revolver from the Houston Police Department, the revolver was in Ary's possession when the Houston Police Department arrested him, and Rogers sent the revolver to the lab for testing. Rogers obtained a search warrant for Jennifer Paddy's vehicle, a Dodge Magnum. Rogers agreed that his affidavit for the search warrant stated that he was told that Chambers stated in her interview that Ary was the shooter and that she confessed to "covering for the shooter." According to Rogers, the pink .22 caliber weapon recovered from Paddy would not have been capable of shooting a .357 round, and a .38 caliber or .12 gauge shotgun weapon could not fire a Sig .357 round. Rogers also obtained buccal swabs from Charles Brown, Michelle Brown, Storey, Everett, Paddy, Duncan, and Cadoree, and sent the swabs for testing.

Testimony of Dr. Tommy Brown

Dr. Tommy Brown, a forensic pathologist, testified that he works with Dr. Wayne, who performed an autopsy on Ray Burger on September 14, 2015, and that he was testifying as to Dr. Wayne's report because Dr. Wayne was unavailable to testify. According to Dr. Brown, he read the offense report and, in his opinion, it

10

appeared that a bullet when through the door, causing splinters from the door to hit Burger in the face, and the bullet hit Burger in the face at the upper part of the nose and between the eyes. Dr. Brown testified that a "[c]opper jacketed bullet, medium caliber" was collected from Burger's head during the autopsy. Dr. Brown agreed that the bullet was larger than a bullet from a .22 and not from a shotgun. According to Dr. Brown, a toxicology report revealed that Burger had amphetamine and methamphetamine in his system at his time of death but not enough to contribute to his death. Dr. Brown testified that the bullet struck Burger's brain stem, and in his opinion, resulted in instantaneous death. Dr. Brown testified that Dr. Wayne opined in his report that the cause of death was penetrating gunshot wound to the head and the manner of death was homicide. According to Dr. Brown, Burger was facing in the direction of the shooter.

Testimony of Sergeant Carlos Cantu

Sergeant Carlos Cantu with the Houston Police Department testified that in October of 2015, he was working for the central division fugitive unit and was tasked with seeking out people with outstanding felony warrants. According to Sergeant Cantu, he went with other officers to an apartment on South Lawn in Houston on October 27, 2015, to execute a felony arrest warrant. The area was dangerous and known for a lot of gang-related crime. When they pulled up to the apartment complex, Cantu exited his vehicle and noticed a male sitting in a car nearby with the

11

door open who had a female on his lap, and when the male saw law enforcement arrive, he abruptly pushed the female off his lap and "took off quickly around the corner." At trial, Cantu identified Ary as the male that ran from the officers.

When Sergeant Cantu walked by Ary's vehicle, he looked inside the window and saw a "dark-colored revolver pistol[]" in plain view on the passenger floorboard where Ary had been sitting. Ary initially identified himself to law enforcement with two different false names, and law enforcement was ultimately able to positively identify Ary and confirm that he had an outstanding warrant for burglary in Liberty County. Cantu testified that the gun they recovered from Ary's vehicle was in Ary's care, custody, and control because it was within his reach, he was arrested for unlawfully carrying a weapon, and the gun was collected and tagged as evidence into the Houston police property room. According to Cantu, the gun was loaded with five unfired .38 caliber hollow-point rounds.

Testimony of Jamie Storey

Jamie Storey testified that at the time of trial she was serving a two-year sentence for credit card abuse and had previously been convicted of two other state jail felonies. According to Storey, on September 13, 2015, she was visiting her friends, Duncan and Burger, at the trailer where the Browns lived. Storey testified that she, the Browns, and Hogan walked to the Chevron on 1960 around 9:30 p.m. and bought cigarettes and drinks and played gambling machines there. Storey

12

testified that she had just met the Browns and Hogan earlier that day and that it was Michelle Brown's and Storey's idea to go to the store because they wanted cigarettes. Storey testified that Duncan and his friends, Everett, Ainsworth, and Burger, whom Storey knew from before that day, stayed at the house but were also getting ready to leave. Storey testified that Chambers and Cadoree stopped by the store, and Cadoree told Storey that he stopped by the trailer looking for Duncan but that no one was there. Storey testified that she did not "hang out" with Chambers but knew her mother, and she knew Cadoree well and methamphetamine was his drug of choice.

According to Storey, about ten to fifteen minutes after Chambers and Cadoree left, the four of them walked back to the trailer. Storey testified that when she walked in, Everett's face was "busted open" from being hit with a pistol and Everett said that Burger was dead. Storey testified that she grabbed Everett to get him to his car and to take him to the hospital, but the police arrived before they could get into the car and held them at gunpoint and separated them.

Storey testified she voluntarily gave law enforcement a statement and a DNA swab, and law enforcement took her phone. Storey testified that in September of 2015, she was an addict using heroin every day or every other day, but she had not used drugs the night of Burger's death and did not buy drugs from Duncan because he only sold methamphetamine. According to Storey, Cadoree was also a drug addict

13

and Cadoree had been inside the trailer earlier that day buying methamphetamine from Duncan in the back bedroom, but she did not recall seeing anyone with Cadoree.

Testimony of Rebecca Yrana

Rebecca Yrana testified that on September 13, 2015, she was working as a cashier at the West Side Grocery on Highway 1960, and she saw Michelle Brown, Jamie Storey, Charles Brown, and Chucky Hogan come in and play machines about 9:00 or 9:30 p.m. Yrana testified she had seen them before, that they lived nearby, and that prior to them playing gaming machines one of the females bought ice cream. According to Yrana, about 10:30 p.m., two individuals got out of the driver's side back seat of a car in the store's parking lot. Yrana testified that the two individuals, a white female Yrana identified as Kay Chambers and a black male identified as Cori Cadoree, got out of a car, came in the store, had a heated discussion for five or ten minutes with Storey, and at one point Yrana believed she heard someone say that "they didn't want that person in the house." Yrana testified that after the discussion, the black male left the store, the white female called the black male's name, "Cori[,]" and the black male responded, "I will f------ handle this s---. Don't worry. Trust me. I got this." Yrana testified that she could see from the video that there was another hand, not Chambers's or Cadoree's, that emerged from the vehicle. Yrana testified that after Chambers and Cadoree left, the four individuals playing the machines also

14

left. Video surveillance from the store obtained by police the following day was admitted into evidence and published to the jury.

Testimony of Deputy Robert Dunn

Deputy Robert Dunn with the Liberty County Sheriff's Office testified that he generated a report after extracting data from Duncan's Android cell phone he received from the Dayton Police Department around September 13, 2015.

Testimony of Thomas Duncan

Thomas Duncan testified that he had previously been convicted of unlawful possession of a firearm by a felon and for possession and manufacture and delivery of methamphetamine. According to Duncan, he was released from the penitentiary in February 2015, and in September 2015, he was dealing methamphetamine out of the Browns' trailer on Elaine Street. Duncan testified that the Browns were methamphetamine users to whom he sold and that was probably why they allowed him to stay at their house. Duncan testified that he stayed in the back bedroom and that his buyers would sometimes come inside to buy drugs and sometimes he would meet them outside the trailer. Duncan explained that Hogan was a user that he sold drugs to and he also sold meth to Storey. Duncan testified that Cadoree was an "associate" and Duncan had sold methamphetamine to Cadoree and Kay Chambers on prior occasions. On September 12, 2015, Chambers's brother had stabbed Duncan in the arm while robbing him of drugs.

Duncan testified that the next morning, September 13, 2015, Cadoree texted him and wanted to trade an Xbox for methamphetamine. According to Duncan, Cadoree had never bought more than a gram of methamphetamine, and around noon, a white female in a van drove Cadoree over to the Brown's trailer, Cadoree came in alone, and Cadoree traded Duncan an Xbox for meth. Duncan testified that Cadoree may have returned that day to buy three and a half more grams of methamphetamine. Duncan testified that later that evening he, Ainsworth, Everett, Burger, Hogan, Storey, and the Browns were in the trailer and Cadoree texted Duncan for an ounce and a half of methamphetamine. Duncan testified that because he knew Cadoree did not have $1200 to pay for the drugs, "something gave [Duncan] a funny feeling[]" like maybe the police were involved and he ignored Cadoree's calls.

Duncan testified he and Burger were in Duncan's room and Duncan fell asleep. Duncan was awakened when he heard a black male voice that sounded similar to Cadoree say, "Where is the dope? Where is the money?" like it was a robbery. When Duncan sat up, he saw people coming down the hallway and he slammed the bedroom door and put his shoulder against it. Duncan testified that he was confused because he did not believe Cadoree would rob him and Cadoree was "like a Teddy bear[.]" According to Duncan, he could not see their faces, he saw shadows and one was "[b]ig. Another one had dreads[,]" but he did not see Cadoree. Duncan testified that he held the door and asked Burger to help him. Burger came

16

over on the side of Duncan and helped hold the door by putting his shoulder against it. Duncan testified that at least two people were pushing and kicking on the other side of the door, and that while he and Burger were holding the door it came off the hinges.

Duncan testified that after they struggled with the door for about thirty seconds, he heard a gunshot and he saw Burger fall with a gunshot wound to the face. According to Duncan, the door got kicked again, he fell back towards the bed, he got up and saw someone holding a silver pistol but did not see the face of the shooter, and then he saw everyone run out. Duncan testified he grabbed his .12 gauge loaded shotgun from the closet and ran out of the trailer the opposite way. Duncan testified that he "was going to jump the fence but the car went that way. . . . [and] [a]fter that [he] threw [the shotgun] under the back side of the trailer[]" because he was a felon and it was illegal for him to possess a firearm. A younger male that was not at the trailer that night gave Duncan a ride to a motel room in Dayton, where he stayed with a girlfriend and Ainsworth until the police arrived the next morning. Duncan testified he went back to jail in October 2015, and he was released in January 2017.

Duncan gave the Dayton Police his shoes because they had Burger's blood on them. He also gave the police his cell phone and a statement. According to Duncan, the statement he gave was the same as what he had testified to regarding what he

17

had witnessed. Duncan later learned that some of the people at the trailer that night had gone to play the machines at the gas station. The cell phone extraction from Duncan's phone was admitted into evidence and Duncan verified from the document the texts and calls that night from Cadoree's phone number, including texts in which Cadoree referred to a female and stated, "Bro, she say she don't wanna ride that late with the issue. How long do you think it will be?" and "She say her kids got school tomorrow. She's about to leave." Duncan testified the texts confused him and he did not know who the female was that Cadoree referred to in the texts.

Duncan testified that Kelsea is "like a relative[]" and is the daughter of the people from whom he rented a house after his most recent release from prison, that on April 23, 2019, Duncan received messages through Kelsea's Facebook account from "Tone Pops," and that because the only person he knew that went by "Tone" was Antonio Ary, he believed the messages were from Ary's father, whom Duncan had never met or talked to. Over defense counsel's 403 and 404 objections, Exhibit 188, Duncan's "screenshots" of the messages from "Tone Pops[,]" were admitted into evidence and published to the jury. Duncan testified that "Tone Pops" messaged that he "need[ed] to get you ASAP[]" because "he asked me to." When Duncan responded for "Tone Pops" to just call him, "Tone Pops" messaged "It's beneficial to you but no phone[,]" that he "live[d] behind the fruit stand in Raywood[,]" which was also where Kelsea lived, and that he had just served a twenty-two year sentence

18

and "Will be up later on." According to Duncan, he believed this was a threat, he thought Ary's father was going to come to his house, he bought a gun, and he sent his children to another county.

Testimony of David Jordan

David Jordan, Kay Chambers's brother, testified that at the time of trial he was serving a five-year sentence for unlawful possession of a firearm and that he had previously been convicted of multiple felonies. He denied stabbing Duncan on September 12, 2015, but he admitted being high and having a disagreement with Duncan that day. According to Jordan, on September 14, 2015, his friend Cadoree came to his house "walking up crying telling me that some foul stuff went on the night before[.]" Jordan testified that he heard one of his friends got shot and the people that had committed the crime were running around with his sister that night. Jordan broke into Chambers's locked bedroom, woke her up, and made Cadoree, Chambers, and a man in bed with Chambers that Jordan later identified in a lineup and at trial as Ary, leave the house because Jordan's young children were at the house. Jordan testified that he did not know then or at the time of trial who killed Burger, but he made everyone leave his house that day, including his sister because he was "mad at everybody." According to Jordan, Ary never said anything, but Ary left with Kay and Cadoree.

<u>Testimony of Austin Ainsworth</u>

Austin Ainsworth testified that in September 2015, he was staying with the Browns and Duncan at the trailer and that Duncan dealt drugs in Duncan's room. Ainsworth testified that he was not really friends with the Browns but that he was friends with Duncan who was friends with the Browns. According to Ainsworth, on the night of September 13, 2015, he, Duncan, Burger, and the Browns were at the trailer just "[h]anging out." Ainsworth testified that around 10:30 or 10:45 p.m. he was lying on a futon in the living room by the door to the trailer when he heard a knock at the door and a female voice asked for Duncan. Ainsworth testified that Everett answered the door, told the female to come in, and walked towards the back of the trailer where Duncan and Burger were. Ainsworth testified that he sat up and was going to close the door because no one was coming in, but the door swung open and the female came in and put a gun in Ainsworth's face. Ainsworth testified he covered up with a blanket as soon as he saw the gun and he did not see the female's face or recognize her voice. Ainsworth testified the female said, "Don't move or you're going to get shot[,]" so he did not move. According to Ainsworth, he heard hollering and "[m]aybe two minutes[]" later, he heard a gunshot. Ainsworth testified that he heard a male voice in a panic say from the hallway toward the back of the house, "We need to leave[,]" and then he heard people running and the door to the trailer slam shut. Ainsworth testified he got up and locked the door and went to the

20

back of the trailer. He saw Everett with blood coming from his nose and holding his midsection with his arms, and 911 was called. According to Ainsworth, he and Duncan left the scene, rode around Liberty for a while, and then went to a motel room in Dayton. Ainsworth testified he learned two days later that Burger had been killed.

Ainsworth was interviewed by detectives and he told them that during the robbery a white female had held a gun to his head and that he saw a black male with dreadlocks. Ainsworth testified that he was not able to identify anybody that came into the trailer in a photo lineup. Ainsworth testified he did not know how many people came in and he heard other voices he did not recognize while under the blanket.

Testimony of Jennifer Young

Jennifer Young, a forensic DNA scientist with the Texas Department of Public Safety crime laboratory in Houston, testified that she did the DNA interpretation and comparisons on the items that were sent in for DNA analysis in this case. Her reports were admitted into evidence. She testified a DNA profile from a used cigarette from the ashtray of the Ford Dodge Magnum in this case was obtained, and Young determined that "[o]btaining this profile is 114 septillion times more likely if the DNA came from Antonio Ary than if the DNA came from an unrelated, unknown individual[,]" that "[b]ased on the likelihood ratio result,

21

Antonio Ary cannot be excluded as a possible contributor to the profile[,]" and "[a]ll other reference profiles [Young] had for comparison were excluded as contributors of this profile." According to Young, from the DNA extract on a swab of the front passenger headrest in the same vehicle, she determined a partial DNA profile interpreted as a mixture of three individuals. Young testified that obtaining that profile "is 41,600 times more likely if the DNA came from Antonio Ary and two unknown individuals than if the DNA came from three unrelated, unknown individuals[,]" and "[b]ased on the likelihood ratio of result, Antonio Ary cannot be excluded as a possible contributor to the profile." Young testified that Ary was excluded as a contributor to the DNA profiles from sections of the bedroom door that were tested.

Testimony of Kay Chambers

Kay Chambers testified that at the time of trial she was serving a fifteen-year sentence for burglary of a habitation in this case and had entered into a plea agreement with the State to plead guilty to burglary of a habitation in exchange for her cooperation and to drop the charge of capital murder against her. Chambers agreed that part of her plea agreement was to take responsibility for the capital murder of Burger, testify as to what happened, and be convicted of burglary of a habitation with intent to commit another felony.

22

According to Chambers, about three days after Burger's murder she turned herself in to the Dayton Police Department. Chambers testified that on September 13, 2015 around 8:30 or 9:00 p.m., her cousin, Jennifer Paddy, picked her up from where she was living in Liberty. Chambers testified Paddy was driving her dark green Dodge Magnum and that Chambers was catching a ride to Dayton to get "a dime sack of weed." Chambers testified that when Paddy picked her up, Cadoree, Dre Bush, and Ary were in the car with Paddy, and she got in the middle of the back seat and smoked weed with them. Chambers testified she did not know Ary at the time but had known Cadoree for over ten years, and she had seen Bush one or two times before at Paddy's house. Chambers testified that Paddy was driving, Ary was in the front passenger seat, and Chambers, Cadoree, and Bush were in the backseat.

Chambers testified that as they drove towards Dayton, Cadoree was texting on Paddy's phone, and Paddy said, "Well, tell them that I got to get back to my kids. I got to get them ready for bed." Chambers testified that Cadoree responded, "He's not answering me[,]" and then Paddy said to Chambers, "Kinfolk, I got to make a stop real quick[.]" Chambers testified she did not know what they were talking about. According to Chambers, she knew who Duncan was, but no one in the car said they were going to rob Duncan and she had no idea that they were going to rob him until after it happened. Chambers testified that her brother had gotten into an

23

argument with Duncan before Burger's murder and she had "gotten high" around Duncan before.

Chambers testified they passed by a trailer and no one was there so they went to the nearby West Side Grocery, Chambers got out to go to the restroom and get cigars, and when she came back to the car, Cadoree was still in the store until a few seconds later when he got in the car. According to Chambers, Paddy said, "Well, I'm just going to go by there. I'm going to knock on the door[,]" and Cadoree responded, "That's on you."

Chambers testified that they drove back to the trailer and parked on the street. Paddy got out and walked towards the trailer and then came back and waived at Ary or Bush to come to the trailer, Ary and Bush got out of the car, and Chambers and Cadoree stayed in the car. Chambers testified that she did not see any guns until they got back in the car. According to Chambers, about two seconds later she heard one gunshot from the direction of the trailer and Paddy, Bush, and Ary ran back to the car. Chambers testified that in a "panic" she jumped in the driver's seat and after the others got in the car she drove off. Chambers testified that everyone was screaming, Paddy screamed at Ary, "Why did you shoot him?" and Ary screamed, "He had a gun, and everybody is involved." Chambers testified that Paddy and Ary said that "[i]f anybody talks we're all going down [and] [e]verybody is going to be charged." Chambers testified that Paddy and Ary wanted her to get bleach so she went to her

24

brother J.R.'s house to get bleach, which Ary used to wipe something down. Chambers testified that she remembered Ary handing guns to Cadoree in a "rag or shirt or something." According to Chambers, Paddy and Ary kept saying that everyone was an accomplice as Chambers drove to a game room where Bush and Paddy got in someone else's car with him. Cadoree got out by the train tracks on the river and took the guns with him. Chambers testified she saw more than one gun but could not describe them. Chambers testified that Paddy followed her while she put gas in the car, and then they drove to Paddy's sister's in Ames. According to Chambers, Paddy told her they were going to take Paddy's car to her sister's and act like the brakes were out so the car could not be placed at the murder scene. Chambers parked Paddy's car at her sister's and Chambers and Ary got in the car with Troy. Chambers testified she and Ary got out at her sister's house, and they had decided to say that Paddy's brakes were out and she could not take Ary back to Houston. Chambers testified that she and Ary went in her house while her brother David was sleeping, and she went to sleep with her kids while Ary sat in a chair and also paced in the bedroom. Chambers testified Ary kept saying he had to get back to Houston and that "the dude had a gun." According to Chambers, the next morning her brother kicked her bedroom door in after Cadoree showed up at daylight and told her brother what had happened and who was in the room with her. Her brother was mad, he had something like a bat in his hand, and he told Ary to leave. After that, Ary ran off and

25

Paddy came to get her in the Magnum, and they went to Baytown. According to Chambers, later Paddy told her they had planned to rob Duncan and what had transpired. Chambers knew people were looking for her because her brother David had told her that he was going to talk to a detective and tell them what happened. Her brother told her to turn herself in and she sneaked away from Paddy and met police in Baytown. Chambers gave the police a recorded interview and consent for them to download what was on her phone.

Chambers did not remember having an argument or conversation with Cadoree at the convenience store and she did not remember Cadoree talking to anyone else at the store. Chambers testified that she had received threatening texts and letters at the jailhouse, had been followed by people, and that she reported it to law enforcement and believed that the threats were attempts to get her to not testify. Chambers agreed she had used crack cocaine and methamphetamine, and she has another prior conviction for burglary of a habitation.

Testimony of Cori Cadoree

Cori Cadoree testified that he pleaded guilty to burglary of a habitation with intent to commit another felony in exchange for a twenty-year sentence and he had to take responsibility and truthfully testify about Burger's murder. Cadoree testified that he has been to the penitentiary twice for drugs and that on September 13, 2015,

26

he was addicted to methamphetamines. Cadoree testified that he bought his drugs from Duncan but only in small amounts.

On September 13, 2015, he was at Paddy's house, whom he had known for fifteen or twenty years. According to Cadoree, Paddy was selling crack cocaine and methamphetamine at that time. Cadoree testified that around noon that day Paddy drove him to Duncan's trailer in her gray Magnum, where he bought methamphetamine from Duncan. Cadoree testified that once they were back at Paddy's house, she asked if he wanted to rob Duncan, and Cadoree "was okay with it[]" and "felt like [he] could get some free dope out of it." Bush, Chambers, and Ary also came over to Paddy's house and they all discussed the plan to rob Duncan and they were all okay with the plan and "were all trying to figure out the best way to get it done[.]" According to Cadoree, he did not know Bush or Ary before that night. Cadoree testified he saw two handguns while they were planning the robbery—a gun with a pink handle that Paddy had and a revolver—and later he saw Ary with an automatic gun. Cadoree testified that he was going to be "along for the ride for directions . . . [t]o show them where [Duncan] stayed at." Cadoree testified that that night he called and texted Duncan many times to get Duncan to answer his phone so that they could make sure he was there to rob him, but Duncan did not respond or answer the calls.

27

Cadoree and the others left in the Magnum with Paddy driving and Ary in the front seat. According to Cadoree, they stopped at West Side Grocery, Chambers went inside to pay for gas, and Cadoree went inside to talk to some people. Cadoree testified that he saw Storey at the store playing the machines, and he talked to her about getting together later than night and doing drugs. Cadoree testified that they left the store and rode in Paddy's car to the trailer where Duncan was staying and, although they had planned to rob Duncan, they had not planned any specifics except that Paddy, Bush, and Ary were supposed to go in to rob Duncan and Chambers and Cadoree were "along to get a free high . . . because we were both addicts." Cadoree testified that Paddy walked to the trailer and then came back and told Bush and Ary to "come on." Cadoree testified that he saw Ary with a dark, big gun different than the two he already knew about and saw earlier that day, and Ary cocked the gun and said, "F--- it." Cadoree testified that he was playing a game on his phone and Chambers had climbed into the front seat. Cadoree then heard a gunshot and everyone came running out "crying, going crazy[]" and got in the car. Paddy said, "Why, why?" and Ary was saying, "Man, it's over. It's over. He dead. He gone." Chambers drove them back to Liberty, and Cadoree told them to let him out of the car because he was afraid after he heard them talking about what had happened. Cadoree took the pink and the black gun and the revolver, but not Ary's gun, and he put the two guns in his socks and buried them in a hole along the road.

Cadoree spent the night at a hotel and around 6:30 the next morning, he went to Paddy's house but Paddy was not there, and then he walked to the house where Chambers and David Jordan lived. He was surprised to see Chambers in bed with Ary and he wanted to get away from the whole situation, so he left but ran into Jordan. Cadoree told Jordan what happened and that Ary was the shooter, and Cadoree left. According to Cadoree, Tristan Liggons, Paddy's "baby daddy," asked Cadoree to bring him the guns Cadoree had buried so Cadoree gave the guns to Liggons. Cadoree testified he then "[w]ent on the run[]" to Houston but was eventually caught. Cadoree testified that he gave a statement to law enforcement about three days after he was caught but "[s]ome of the stuff [he] lied about[]" because he was afraid of spending his life in prison. Cadoree testified that he originally told law enforcement that Ary was the only one that had a gun, and when he was pressed by investigators who said there was more than one gun, he admitted the truth that there were multiple guns and said he had lied because he was afraid of what might happen. Cadoree testified that he later came in and gave a different statement where he told the truth. A photo lineup in which Cadoree identified Ary was admitted into evidence, and Cadoree testified that initially he did not pick Ary but then changed his mind and picked Ary, whom he also identified as the defendant at trial.

Cadoree agreed he had a conviction in 2002 for felony theft, third or more, that he had had a bad methamphetamine addiction, and that Duncan was often the person he bought his drugs from. Cadoree testified that he was going to testify but backed out a couple of times because he did not want to be labeled a "snitch" and be retaliated against.

Testimony of Dre Bush

Dre Bush testified he pleaded guilty to the murder of Ray Burger and received a twenty-year sentence in exchange for taking responsibility and testifying at trial. Bush testified that his friend Paddy called him September 13, 2015, and she asked where his gun was because she was trying to rob someone. Bush testified he had a black .357 Glock. Bush testified he arrived at Paddy's house about 8:00 p.m., they planned to do a robbery to steal drugs and money, and that Paddy, Cadoree, Chambers, Ary, and he agreed to commit the robbery. Bush testified that at the time his hair was in small "dreads."

According to Bush, Paddy was the first to go inside the trailer, and she had a small revolver. Bush testified that he had a pistol, and he gave Ary his .357 Glock after he showed it to Ary and Ary said he wanted to use it. Ary went inside the trailer second and was in the hallway when Bush went inside, and Paddy was holding her gun on a male lying on a couch in the living room. According to Bush, he, Paddy, and Ary did not say anything as they walked into the trailer. Bush then went to

another room to make sure nobody was in there. As Bush was about to lift a mattress, he heard a gunshot from the other side of the trailer and neither he nor Paddy had fired the guns they had. Bush told the jury he was never in the hallway from the back bedroom, he did not see Ary go into the back bedroom, and he did not see Ary "messing with" the back bedroom door, and he did not hear a commotion involving someone banging on a door. Bush looked to see if anybody got shot and he did not see anyone. Bush ran towards the door to go outside, and Paddy was holding the door open for him to run out of the trailer. Bush did not see Ary come running out of the trailer until Bush got outside. Bush testified he and Paddy got into the car on the "back side of the driver's side[,]" Chambers was driving, Cadoree was behind the passenger seat, Ary was the last one to get in the car, and Ary got into the passenger's seat. According to Bush, no one said anything as they left but then Ary said, "I think I shot somebody. I think I shot somebody." Afterwards, they split up and Cadoree took all three guns. Bush testified that they went to Chambers's brother's house and "[e]verybody" wiped the car doors with bleach and wiped the inside of the car. Bush went to Paddy's sister's house and found out later that Burger was shot in the face.

Testimony of Jennifer Paddy

Jennifer Paddy testified that she entered into a plea agreement and pleaded guilty to murder and she was required to take responsibility for the capital murder

31

of Burger and testify at trial. According to Paddy, on September 13, 2015, Cadoree was at her house and originally brought up the idea of robbing Duncan because Duncan supposedly had $13,000 and drugs, and he asked Paddy if she knew somebody that could rob Duncan for them. Paddy told him that she would try to get people to rob Duncan and Bush and Ary agreed to come over and help. Paddy testified that she, Cadoree, Chambers, Bush, and Ary all agreed to rob Duncan with guns.

Paddy testified that she stole a pink and black gun from her cousin's house. Bush had a black gun and Ary had a gun. Paddy testified that when they left her house in her Dodge Magnum, she was driving, Cadoree, Ary, and Bush were in the car, and they picked Chambers up around 10:00 p.m. Paddy testified that they circled around the trailer where Duncan stayed and then went to the convenience store on 1960 where Chambers and Cadoree got out of the car, and Paddy, Ary, and Bush stayed in the car. Paddy testified that Cadoree was texting Duncan acting like he wanted to buy drugs from him, but Duncan was not responding. Paddy testified that after Cadoree and Chambers got back in the car, they circled around Duncan's trailer again waiting for him to respond. Paddy testified they stopped at the trailer and parked on the side of the road and did not pull into the driveway. Paddy got out of the car, knocked on the trailer door, and a white man answered the door. Paddy asked him if Duncan was there, he said yes and he told her to come in, but she went back

to the car to get Bush and Ary. Paddy had her gun tucked under her shirt and Ary had a gun. Paddy, Bush, and Ary went inside the trailer. Bush and Ary entered first and she walked in last. She pointed her gun towards the man lying on the couch and asked him to be still. Paddy testified that she stayed in the living room and Ary and Bush went down the hallway moving fast but not saying anything. Paddy testified that after she was standing there a few seconds, she saw Bush come back to the living room and as he looked into another bedroom, they heard a pop like a gunshot, and Paddy and Bush ran out of the trailer. Paddy testified that Ary ran out of the trailer behind them and they all ran and got in the car.

According to Paddy, Chambers had switched to the driver's seat and drove the car from the trailer. Paddy testified that in the car Ary slapped his hands on the dash and said "[f]ree body[,]" which she interpreted from a song as meaning killing someone and getting away with it. Paddy told the jury that during the car ride back to Liberty, Ary asked her if there was blood on him and also said, "Take me to Houston." Ary threw his long-sleeve shirt that he had been wearing out the window of the car. Paddy testified that when they got back to Liberty, Cadoree wanted to get out of the car and he told them to give him the guns. Cadoree took all three guns. Paddy testified that Chambers then drove them to a game room where Chambers called her brother, J.R., and they drove to a house where Chambers got a bottle of

bleach, and they each wiped the doors where they had been sitting and where fingerprints would be.

They went to a convenience store on Highway 90, a man met them there, and Paddy and Bush got out of the car and into the man's car. The man was going to give them a ride back to Paddy's sister's house. Paddy thought Chambers was going to take Ary back to Houston. At Paddy's direction, Chambers ultimately left Paddy's car at Paddy's sister's house, and Chambers and Paddy later invented the story that the car was broken down so it could not be placed at the scene. That night, Paddy and Bush stayed at Paddy's sister's house and Chambers and Ary stayed at Chambers's house. Chambers called Paddy and told her that the people she lived with were family members of Burger and that they said Burger had been killed. Paddy testified that she and Chambers tried to come up with a "cover story[]" to show they were not involved in the murder.

Paddy testified that she got the pink and black gun back, she asked Tristan Liggons, who was the father of her child and Ary's relative, to get the other guns back from Cadoree, and he got them back. Paddy eventually turned herself in to the police.

Testimony of Texas Ranger Brandon Best

Brandon Best, a Texas Ranger with the Texas Department of Public Safety, testified that he was called to investigate a homicide and home invasion in Dayton.

34

At the scene, Best obtained information from other law enforcement personnel, and he participated in witness interviews. When he spoke with Everett he could see that Everett was "extremely shook up[,]" Everett said he had been assaulted with a pistol, and both Everett and Duncan were reluctant to speak with the officers. The Dayton police received information that the vehicle used during the crime was parked at Bonnie Paddy's house and they obtained a search warrant for the vehicle and pulled whatever DNA evidence could be collected from the vehicle.

Ranger Best explained that the Dayton Police Department received information that Chambers was willing to come in and give a statement about what had happened. Best and the Dayton Police Department interviewed Chambers, and she was a bit reluctant but appeared to trust the Dayton detectives enough to talk to them because the detectives knew her family. Cadoree was later apprehended, brought in on a warrant for his involvement in this crime, and interviewed by Best and the Dayton Police Department. According to Ranger Best, from Cadoree's and Chambers's interviews and other witnesses and evidence, the Texas Rangers determined that Paddy, Ary, and Bush were also involved, warrants were issued, and they were all arrested. Paddy, Ary, and Bush were not willing to talk to law enforcement in 2015, but later Paddy and Bush decided to cooperate and with their attorneys present each one agreed to be truthful about what happened as part of plea agreements.

According to Ranger Best, a shell casing which was found at the scene was from a .357 Sig or Glock, which is a unique caliber. Ranger Best testified that DNA evidence connected Ary to the car. Four of the five co-defendants pleaded guilty, and Best conducted all except one of the debriefing interviews with the four co-defendants.

Testimony of Undrey Bradford, Jr.

Undrey Bradford, Ary's cousin who lived in Ames, testified for the defense. Bradford testified that he had known Ary for most of his life and maintained a relationship with him. According to Bradford, other people often drove Paddy's car that looked like a Magnum. In 2015, Ary lived with his mother in the Houston area and would visit Liberty County because he had family there. Ary was a rapper who went by the name "TV Tone[]" and Ary advertised his rap abilities on social media.

Bradford learned of Burger's murder the morning after the shooting when he looked at his phone and "it was on the internet and my girl told me somebody got shot in Dayton." According to Bradford, Ary was staying at his house the night of the murder and, as far as Bradford knew, Ary was there the entire night. Bradford told the jury that, despite talking to the prosecutor on prior occasions, Bradford had never told anyone prior to trial that Ary was with him the night of the murder because "nobody asked." Bradford admitted messaging Duncan after the murder and before trial but denied that Ary or anyone on Ary's behalf asked Bradford to contact Duncan

36

about the trial or to influence Duncan's testimony as to what happened. Bradford admitted he contacted Duncan a second time about him getting in touch with someone, but he never talked to Duncan about the trial. Bradford also agreed that he told the prosecutor when they met prior to trial that he got constant calls to contact Duncan "and they know they are recorded." Bradford testified that defense counsel asked him in 2015 for Duncan's number and in 2019, a couple of months before trial.

Testimony of Donna Brown Clay

Donna Brown Clay, a private investigator, testified for the defense. She testified that defense counsel had obtained authorization through the court to hire her in 2017 to investigate the case. Clay testified that she first investigated whether Ary had an alibi, and she discussed with Bradford where Ary was on the night of the murder. Clay spoke with Duncan and despite that fact that she represented to him that she was a private investigator and the business card she provided him stated the same, she was advised that Duncan thought she was with the State. According to Clay, before she met with Duncan, defense counsel advised her that the State wanted to speak with Duncan, and when she met Duncan she told him that the D.A. wanted to speak with him. Clay testified that she was apprised that Duncan decided he did not want to meet with anyone.

Extraneous Offense Evidence

In his first issue, Ary argues the trial court committed reversible error by admitting evidence consisting of text messages sent to Duncan which Ary argues refer to an extraneous offense. The testimony and the trial court's ruling relating to this evidence was as follows:

| | |
|---|---|
| [Prosecutor]: | I show you what's been marked as State's Exhibit 188. Do you recognize this? It's a couple of pages. |
| [Duncan]: | Yes. |
| . . . . | |
| [Prosecutor]: | Okay. Are those screen shots that were on your phone? |
| [Duncan]: | Yes, sir. |
| [Prosecutor]: | You printed these out, and you gave this to the D.A.'s office? |
| [Duncan]: | Yes, sir. |
| [Prosecutor]: | Now, these were on your phone that came as a message and how you received them, right? |
| [Duncan]: | Yes, sir. |
| [Prosecutor]: | You gave those to the D.A.'s office? |
| [Duncan]: | Yes, sir. |
| [Prosecutor]: | Your Honor, at this time barring any objection the state would like to enter 188 for all purposes. |
| THE COURT: | Well, it can't be for all purposes. You need to articulate the purpose for which you're making this offer. |
| [Prosecutor]: | Understood, Judge. |
| [Prosecutor]: | How did you take these screen shots? |
| [Duncan]: | On my phone? |
| [Prosecutor]: | No. How did you take them? |
| [Duncan]: | The messages? |
| [Prosecutor]: | What's that? |
| [Duncan]: | The messages? |

38

| | |
|---|---|
| [Prosecutor]: | Yeah. When you got these messages, what did you think? |
| [Duncan]: | Really the one that said, "Just make sure you be up later" -- |
| THE COURT: | Hold on. |
| [Defense counsel]: | Objection. |
| THE COURT: | Now, you have got the witness testifying to contents of a matter that's not in evidence. |
| [Prosecutor]: | I understand. |
| THE COURT: | Why don't you articulate the purpose of this offer. What do you on behalf of the state of Texas intend to show or prove by this offer? |
| [Prosecutor]: | To show that the witness was tampered with in regards to testifying in this trial and to what his testimony would be. |
| THE COURT: | [Defense counsel]. |
| [Defense counsel]: | Your Honor -- |
| THE COURT: | Objections? |
| [Defense counsel]: | Yes, Your Honor. Under 403 and 404, Judge, I'm objecting to the contents of 188. |
| THE COURT: | I understand 403. What's your 404 objection? |
| [Defense counsel]: | Your Honor, I believe in order for tampering it has to be under an objectively reasonable person's standard. I don't believe [Exhibit] 188 does that. |
| THE COURT: | 403 asks me to do a balancing test, whether the probative value outweighs the prejudicial effect. What's 404? |
| [Defense counsel]: | That's 404, Judge. They are trying to allege tampering which is an extraneous bad act. I believe that the standard for the extraneous bad act or tampering should be under the objectively reasonable person standard. 403 because I believe this is tenuous. I believe the probative value is so low that it's unduly prejudicial to my client. |
| [Prosecutor]: | We would argue for consciousness of guilt. |
| THE COURT: | Your offer is intending to show that someone on behalf of the defendant attempted to tamper with this witness; is that correct? |

| | |
|---|---|
| [Prosecutor]: | That's correct, Judge. We would argue at the direction as well, Judge. |
| THE COURT: | Pardon me? The court has reviewed State's Exhibit -- |
| [Defense counsel]: | 188. |
| THE COURT: | -- 188, the contents thereof, and finds that the probative value is not substantively outweighed by the prejudicial effect. Your 403 and 404 objections are overruled. It's admitted along with an instruction that will follow. |
| [Defense counsel]: | Thank you, Judge. I would also move for a mistrial. |
| THE COURT: | Overruled. |
| [Defense counsel]: | Note my objection, Judge, for the record. |
| THE COURT: | Proceed. |
| [Prosecutor]: | Permission to ask about the contents and publish. |
| THE COURT: | Proceed. |
| . . . . | |
| THE COURT: | Ladies and gentlemen of the jury, you have just heard evidence that may be construed as what the law calls an extraneous offense; that is, a crime for which this defendant is not on trial or other bad acts attributable to this defendant. |
| | Before you can consider this evidence in State's Exhibit Number 188 for any purposes, you must first find and believe beyond a reasonable doubt that this other offense or bad act occurred and that the defendant committed it or is responsible for committing it. |

According to Ary, the trial court overruled Ary's objection before hearing evidence about the circumstances surrounding the text messages and before determining whether the State had additional evidence to support its claim that the

40

text messages were sent by Appellant's father. Ary argues that there was insufficient proof that he was responsible for the text messages because Duncan testified he was not sure who sent the messages, there is no connection shown between Kelsea and Ary's father (the person Duncan believed sent the messages), and Duncan had never met Ary's father. Ary argues the State never called Kelsea or Ary's father to testify regarding who sent the messages. Ary argues that no investigator testified that they investigated to determine whether Ary's father was named "Danny Walker[,]" as stated in a text, and whether he lived at the location indicated in the messages. According to Ary, "[t]here was a total lack of proof that the person sending these text messages was actually [Ary]'s father[.]" Also, Ary argues that because the trial court acknowledged during the testimony of another witness that no evidence supported that Ary or anyone on Ary's behalf tried to tamper with anyone, the trial court could not have reasonably admitted the text messages as an extraneous offense of tampering with a witness. Ary argues that with the lack of proof regarding the identity of the individual who sent the text messages, Rule 404 was violated, and with no evidence that any witness had been tampered with, Rules 403 and 404 were violated because there is no extraneous offense. Ary further argues that even if there was an extraneous offense, the probative value of the evidence was substantially outweighed by the unfair prejudice.

We review a trial court's admission of evidence under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002). We will not disturb a trial court's ruling if it is correct on any legal theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Rule 404(b) of the Texas Rules of Evidence provides in pertinent part as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) Permitted Uses; . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Tex. R. Evid. 404(b). The list of enumerated purposes for which extraneous offense evidence may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery*, 810 S.W.2d at 388. Extraneous offense evidence may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387.

Based on the record before us, we conclude that the issue of whether the extraneous evidence was admissible for the noncharacter-conformity purpose of showing Ary's consciousness of guilt was within the zone of reasonable

42

disagreement. *See Wheeler*, 67 S.W.3d at 888. Because the extraneous offense evidence had relevance apart from character conformity, we conclude that the trial court did not abuse its discretion in determining that the text messages were admissible under Rule 404(b). *See Montgomery*, 810 S.W.2d at 388.

Relevant evidence is generally admissible. Tex. R. Evid. 402. Under Rule 403 of the Texas Rules of Evidence, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. Once a trial court determines that extraneous offense evidence is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudicial. *Id.*; *see* Tex. R. Evid. 403. When undertaking a Rule 403 analysis, the trial court must balance

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

43

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). However, if the only value of extraneous offense evidence is to show character conformity, the balancing test required by Rule 403 is obviated because "rulemakers hav[e] deemed that the probativeness of such evidence is so slight as to be 'substantially outweighed' by the danger of unfair prejudice *as a matter of law*." *Montgomery*, 810 S.W.2d at 387 (quoting *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978)).

Here, the State offered the evidence to prove Ary's consciousness of guilt, the time at trial regarding the challenged evidence was small in relation to the entire trial, and the trial court gave a limiting instruction. We presume the jury followed the trial court's instruction. *See Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006).

After balancing the Rule 403 factors, the trial court could have reasonably concluded that the probative value of the extraneous-offense evidence was not substantially outweighed by the danger of unfair prejudice. *See id.* We conclude that the trial court did not abuse its discretion in admitting the challenged evidence. *See Moses*, 105 S.W.3d at 627; *Montgomery*, 810 S.W.2d at 391.

Nevertheless, even assuming without deciding that the trial court may have erred in admitting the challenged evidence, given the other evidence before the jury, it is unlikely that the admission of the text messages had a substantial effect on the

jury's verdict. *See* Tex. R. App. P. 44.2(b); *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). After examining the record as a whole we have fair assurance that the error, if any, did not influence the jury, or had only a slight effect. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). We overrule issue one.

Legal Sufficiency

In his second issue, Ary challenges the sufficiency of the evidence supporting his convictions because he argues there was insufficient evidence to corroborate the accomplice witness testimony. Ary argues the State's evidence showing Ary was with Chambers approximately nine hours after the crime had been committed was not sufficient corroboration of accomplice testimony. According to Ary,

> [t]he State's other attempts to corroborate the accomplice testimony by connecting Appellant to the crime failed either because the State failed to prove extraneous matters beyond a reasonable doubt, the evidence was actually accomplice testimony or prior statements by an accomplice and/or the evidence did not connect Appellant to the crime itself, as opposed to being in a place (the car) at some point in the past when there was evidence that he had a family and friendship relationship to people who drove the car, one of whom was not even involved in the crime.

When evaluating the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902, n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214

45

S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the sole judge of the witnesses' credibility and weight to be given their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). We defer to the jury's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. We presume the jury resolved conflicting inferences in favor of the verdict. *See Brooks*, 323 S.W.3d at 899, n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We "must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999) (citation omitted).

Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice witness without other corroborating evidence tending to connect the defendant to the offense committed. Tex. Code Crim. Proc. Ann. art. 38.14. When conducting a sufficiency review of the non-accomplice evidence under article 38.14, we eliminate the accomplice testimony and examine the remaining portions to determine if there is any evidence that tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could

have found that it sufficiently tended to connect the accused to the offense." *Smith*, 332 S.W.3d at 442; *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). No particular amount of corroborating evidence is required for sufficiency purposes. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

"'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon*, 49 S.W.3d at 361. The corroborating evidence need not directly link the defendant to the commission of the crime. *Vafaiyan v State*, 279 S.W.3d 374, 385 (Tex. App.— Fort Worth 2008, pet. ref'd). There simply needs to be other evidence tending to connect the defendant to the crime. *Id.* When there are conflicting views of the evidence, we defer to the factfinder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

The jury heard testimony from Jennifer Young, a forensic DNA scientist with the Texas Department of Public Safety crime laboratory in Houston, who testified that a DNA profile was obtained from a used cigarette from the ashtray of the Ford Dodge Magnum, and Young determined that "[o]btaining this profile is 114 septillion times more likely if the DNA came from Antonio Ary than if the DNA came from an unrelated, unknown individual[,]" that "[b]ased on the likelihood ratio result, Antonio Ary cannot be excluded as a possible contributor to the profile[,]" and "[a]ll other reference profiles [Young] had for comparison were excluded as

contributors of this profile." According to Young, based on the DNA extract on a swab of the front passenger headrest in the same vehicle, she obtained a partial DNA profile that she interpreted as a mixture of three individuals. Young testified that obtaining that profile "is 41,600 times more likely if the DNA came from Antonio Ary and two unknown individuals than if the DNA came from three unrelated, unknown individuals[,]" and "[b]ased on the likelihood ratio of result, Antonio Ary cannot be excluded as a possible contributor to the profile."

The jury heard Sergeant Cantu testify that when Ary saw law enforcement approach, Ary initially identified himself to law enforcement with two different false names. The jury also heard Chambers's brother, David Jordan, testify that the morning of September 14, 2015, he learned that the people that Chambers had been with had killed someone the night before, and Jordan testified he busted into Chambers's room and Ary was in the bed with Chambers.

We conclude that a rational juror could have found that the non-accomplice evidence sufficiently tends to connect Ary to the capital murder and the burglary of a habitation with intent to commit aggravated robbery. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see also generally* Tex. Code Crim. Proc. Ann. art. 38.14. We further conclude that the evidence is sufficient to support Ary's convictions. *See Brooks*, 323 S.W.3d at 902, n.19; *Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13. We overrule issue two.

48

Having overruled Ary's issues on appeal, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 8, 2020
Opinion Delivered November 4, 2020
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.